# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# VALDOSTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA : | CRIM. NO. 7:14-CR-38 (HL) |
| v. : | |
| KEVIN MURPHY, : | FILED |
| Defendant. : | NOV 15 2014 |
| _____ : | UNITED STATES DISTRICT COURT<br>MIDDLE DISTRICT OF GEORGIA |

## PLEA AGREEMENT

It is agreed by the United States of America, by and through its undersigned attorney, and KEVIN MURPHY, hereinafter referred to as "Defendant," and Defendant's undersigned attorney, as follows:

(1)

Defendant acknowledges that Defendant has reviewed and discussed the Information in this matter with Defendant's attorney and Defendant's attorney has explained to Defendant the attorney's understanding of the Government's evidence.

(2)

Defendant understands that Defendant is not required to plead guilty, and that Defendant has the right to plead not guilty and to elect instead to be tried by jury. Defendant understands that at a jury trial, Defendant would enjoy a presumption of innocence, and that the United States would have the burden of proving Defendant's guilt beyond a reasonable doubt. Defendant understands that Defendant would be entitled to the services of a lawyer at all stages of such a trial. Defendant understands that Defendant would be entitled to confront and to cross-examine the United States' proof, and to present witnesses and evidence in Defendant's own behalf.

1

Defendant understands that Defendant would have the right to testify in Defendant's own behalf, but that Defendant could not be compelled to do so. Defendant has discussed these rights with Defendant's attorney. Defendant is satisfied with the services of Defendant's lawyer. Defendant knowingly and voluntarily waives Defendant's right to plead not guilty and to proceed to trial.

The United States Attorney and Defendant understand and agree that the Court should consider its sentence in light of the advisory Federal Sentencing Guidelines, as explained in United States v. Booker, 543 U.S. 220 (2005). Defendant knowingly and voluntarily waives any further objections that Defendant may have based on Booker, Apprendi v. New Jersey, 530 U.S. 466 (2000), and their progeny. Defendant therefore agrees that at sentencing the Court may determine any pertinent fact by a preponderance of the evidence and the Court may consider any reliable information, including hearsay. Defendant expressly waives any claim of right to an indictment, trial by jury, and/or proof beyond a reasonable doubt on any factual determinations that pertain to sentencing in this case.

(3)

Defendant being fully cognizant of Defendant's rights, and in exchange for the considerations to be made by the United States as set forth in Paragraph (4) below, agrees pursuant to Rule 11(c), Federal Rules of Criminal Procedure, as follows:

(A) Defendant is guilty and will knowingly and voluntarily enter a plea of guilty to Count One of the Information, which charges Defendant with Possession with Intent to Distribute Hydrocodone, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(E)(i).

(B) Defendant fully understands that Defendant's plea of guilty as set forth in Subparagraph (A), above, will subject Defendant on Count One to a term imprisonment of not

2



more than ten (10) years, a maximum fine of $500,000.00, or both, and a term of supervised release of not more than three (3) years. Defendant further acknowledges that the Court is required to impose a mandatory assessment of $100.00 (per count).

(C) Defendant acknowledges and understands that the Court is not bound by any estimate of the probable sentencing range that Defendant may have received from Defendant's counsel, the Government, or the Probation Office. Defendant further acknowledges and agrees that Defendant will not be allowed to withdraw Defendant's plea because Defendant has received an estimated guideline range from the Government, Defendant's counsel, or the Probation Office which is different from the guideline range computed by the Probation Office in the Presentence Report and found by the Court to be the correct guideline range.

(D) Defendant understands fully and has discussed with Defendant's attorney that the Court will not be able to determine the appropriate guideline sentence until after a pre-sentence investigative report has been completed. Defendant understands and has discussed with Defendant's attorney that Defendant will have the opportunity to review the pre-sentence investigative report and challenge any facts reported therein. Defendant understands and has discussed with Defendant's attorney that any objections or challenges by Defendant or Defendant's attorney to the Pre-Sentence Report or the Court's rulings thereon will not be grounds for withdrawal of the plea of guilty.

(E) Defendant understands and has discussed with Defendant's attorney that after the Court determines the applicable guideline range of this case, the Court has the authority under certain circumstances to impose a sentence that is more severe or less severe than the sentence called for by the guidelines.



(F) Defendant agrees to provide a check for the mandatory assessment at the time of sentencing.

(G) Defendant understands that ordinarily 18 U.S.C. § 3742, will in certain cases allow for a direct appeal after sentencing followed by the Court of Appeals' limited review of a defendant's sentence. But once this agreement is accepted and sentence is imposed by the District Court, Defendant by this agreement forever waives any right to an appeal or other collateral review of Defendant's sentence in any court. However, in the event that the District Court imposes a sentence that exceeds the advisory guideline range, then Defendant shall retain only the right to pursue a timely appeal directly to the Court of Appeals after the District Court imposes its sentence. In the event that Defendant retains the right to a direct appeal, that right is limited to appealing sentencing issues only.

Defendant and the United States Attorney agree that nothing in this plea agreement shall affect the Government's right or obligation to appeal as set forth in 18 U.S.C. § 3742(b). If, however, the United States Attorney appeals Defendant's sentence pursuant to this statute, Defendant is released from Defendant's waiver of Defendant's right to appeal altogether.

(H) Defendant and the Government stipulate and agree that there was no detected or identified biological evidence obtained during the investigation and prosecution of the matter which is subject to DNA testing. Defendant further agrees that all evidence obtained in this investigation and prosecution may be destroyed or returned to its rightful owner.

(I) The United States of America and Defendant hereby agree that any breach of this agreement by Defendant occasioned by a failure to cooperate, by withholding information, giving of false information, perjury, or failure to testify in any judicial proceeding in connection with the individuals, matters, and transactions referred to in the information, would:

4



(i) not relieve Defendant of Defendant's plea of guilty;

(ii) permit the Government to reinstate and proceed with prosecution on any other charges arising from the matters referred to in this Information;

(iii) permit the Government to instigate and proceed with the prosecution of any other offenses arising from a breach of this agreement, including perjury, false declaration, false statement, and/or obstruction of justice; and

(iv) permit the Government to utilize against Defendant in any subsequent judicial proceeding any and all statements made by Defendant.

If a legitimate issue arises as to whether or not there has been a breach of this agreement, said question shall be determined by the United States District Court for the Middle District of Georgia. The burden of establishing such a breach shall be upon the United States and shall be established by a preponderance of the evidence. The Federal Rules of Evidence shall not apply in any hearing to establish such a breach, but evidence shall be admitted and excluded at the Court's discretion.

(4)

In exchange for the consideration set forth in Paragraph (3) above, the United States Attorney for the Middle District of Georgia agrees as follows:

(A) That he will accept the plea of guilty by Defendant as provided in Paragraph (3)(A), above, in full satisfaction of all possible federal criminal charges, known to the United States Attorney at the time of Defendant's guilty plea, which might have been brought solely in this district against Defendant.

(B) If Defendant affirmatively manifests an acceptance of responsibility as contemplated by the Federal Sentencing Guidelines, the United States Attorney will recommend

5

to the Court that Defendant receive an appropriate downward departure for such acceptance. It is entirely within the Court's discretion whether or not Defendant would be entitled to any reduction based upon an acceptance of responsibility. The United States expressly reserves its right to furnish to the Court information, if any, showing that Defendant has not accepted responsibility, including, but not limited to, denying Defendant's involvement, giving conflicting statements as to Defendant's involvement, or engaging in additional criminal conduct including personal use of a controlled substance.

(5)

FORFEITURE PROVISION

It is further stipulated and agreed that during the time of the offense(s) stated in Count One of the Information, the Defendant obtained a substantial amount of money, that constitutes or was derived from proceeds traceable to the commission of the aforesaid violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(E)(i).

(A) Defendant hereby agrees to forfeit to the United States voluntarily and immediately all of Defendant's right, title, and interest in any and all property which is subject to forfeiture pursuant to Title 21, United States Code, Section 853, including, but not limited to the following: a personal money judgment in the amount of one hundred fifty thousand dollars ($150,000.00), representing the amount of funds that constitute or were derived from proceeds traceable to the commission of the aforesaid violation(s) of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(E)(i), and should be held joint and several with any personal money judgments imposed against related Defendant Wayne Murphy. The foregoing shall hereinafter be referred to as the ("subject property").



(B) Defendant agrees that the subject property reflects a reasonable compromise between the parties for forfeiture purposes concerning the proceeds the Defendant obtained, directly or indirectly, as the result of the aforesaid violations of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(E)(i).

(C) Defendant agrees that the subject property shall be paid by cashier's check made payable to: "United States Marshals Service, Attention: Janet Wallace, 475 Mulberry Street, Post Office Box 7, Macon, Georgia, 31201, and must be paid prior to or at the time of sentencing.

(D) Defendant agrees to the entry of a preliminary order of forfeiture of the subject property pursuant to Federal Rule of Criminal Procedure 32.2 upon acceptance of Defendant's plea of guilty by the United States District Court, and waives the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. Defendant acknowledges that he/she understands that the forfeiture of assets is part of the sentence that may be imposed in this case and waives any failure by the court to advise him/her of this, pursuant to FED. R. CRIM. P. 11(b)(1)(J), at the time his guilty plea is accepted.

(E) Defendant agrees that the subject property constitutes or was derived from proceeds traceable to violation(s) of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(E)(i) set forth in Count One of the Information, and is subject to forfeiture under Title 21, United States Code, Section 853.

(F) Defendant agrees fully to assist the United States in the forfeiture of the subject property and to take whatever steps are necessary to pass clear title to the subject property to the United States, including but not limited to, surrender of title and execution of any documents

7



necessary to transfer Defendant's interest in any of the subject property to the United States, and taking whatever steps are necessary to ensure that the property subject to forfeiture is not sold, disbursed, wasted, hidden, or otherwise made unavailable for forfeiture.

(G) Defendant agrees to waive all interest and not file a claim to any of the subject property, or any other property subject to forfeiture, in any administrative or judicial forfeiture proceeding, whether criminal or civil, state or federal, which may be or has been initiated, which includes:

(i) the Commercial Bank of Thomasville (Synovus) account ending in 6742 in the name of R. Wayne Murphy Enterprises, Inc. which, as of the date of this plea agreement, contains $197,287.89;

(ii) the Commercial Bank of Thomasville (Synovus) account ending in 8719 in the name of R. Wayne Murphy and Richard W. Murphy, Jr. which, as of the date of this plea agreement, contains $23,864.60;

(iii) the Bank of America account ending in 2247 in the name of James K. Murphy which, as of the date of this plea agreement, contains $10,582.14;

(iv) the sum of $21,762.00 that was seized on November 6, 2009 at Boston Pharmacy and which has since that date remained in a custodial account maintained by the Thomasville Police Department.

(H) Defendant agrees to waive Defendant's right to notice of any forfeiture proceeding involving the subject property, or any other property subject to forfeiture, and agrees not to file a claim or assist others in filing a claim in any such forfeiture proceeding.

(I) Defendant knowingly and voluntarily waives Defendant's right to a jury trial on the forfeiture of the subject property. Defendant knowingly and voluntarily waives all

8



constitutional, legal, and equitable defenses to the forfeiture of these assets in any proceeding. Defendant agrees to waive any jeopardy defense or claim of double jeopardy, whether constitutional or statutory, and agrees to waive any claim or defense under the Eighth Amendment to the United States Constitution, including any claim of excessive fine, to the forfeiture of the personal money judgment by the United States, the State of Georgia, or its subdivisions.

(J) Defendant agrees that forfeiture of the subject property as authorized herein shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty this court may impose upon the Defendant in addition to forfeiture.

(K) Defendant agrees to hold harmless, release, and forever discharge the United States, its officers, agents, attorneys, servants, and employees, from any and all actions, causes of actions, suits, proceedings, debts, dues, contracts, judgments, damages, claims, or demands whatsoever in law or equity which the Defendant, his successors, or assigns, ever had, now have, or may have, whether known or unknown, in connection with the seizure and forfeiture of the subject property.

(L) Defendant freely, voluntarily, knowingly, and intelligently waives any right to appeal or collaterally attack any matter in connection with the forfeiture of assets pursuant to this plea agreement.

(M) Defendant agrees that the forfeiture provisions of this plea agreement are intended to, and will, survive him, notwithstanding the abatement of any underlying criminal conviction after the execution of this agreement. The forfeitability of any particular property pursuant to this agreement shall be determined as if Defendant had survived, and that determination shall be



binding upon Defendant's heirs, successors and assigns until the agreed forfeiture, is collected in full.

(6)

Nothing herein limits the sentencing discretion of the Court.

(7)

This agreement constitutes the entire agreement between Defendant and the United States, and no other promises or inducements have been made, directly or indirectly, by any agent of the United States, including any Assistant United States Attorney, concerning any plea to be entered in this case. In addition, Defendant states that no person has, directly or indirectly, threatened or coerced Defendant to do or refrain from doing anything in connection with any aspect of this case, including entering a plea of guilty.

(8)

As an aid to this Court, the United States Attorney and Defendant, by and through Defendant's counsel, enter into the following Stipulation of Fact. This stipulation is entered into in good faith with all parties understanding that the stipulation is not binding on the Court. Under U.S.S.G. Policy Statement Section 6B1.4(d), this Court may accept this stipulation as written or in its discretion with the aid of the Pre-Sentence Report determine the facts relevant to sentencing.

Subject to the above paragraph, the United States Attorney and Defendant stipulate and agree that the Government could prove the following beyond a reasonable doubt:

On November 6, 2009, the Thomas County Sheriff's Department received information from a confidential informant (CI) that a maroon Chevrolet Tahoe was en route to Boston, Georgia with 500 hydrocodone pills. The CI further stated that the driver would be a Hispanic



male named "Nolfo," and that the SUV would stop at a certain location at a certain time. The officers set up surveillance, and at the appointed time a maroon Chevrolet Tahoe stopped at the previously identified location. The police approached the car, which was driven by a Hispanic male who identified himself as Arnolfo Capistran. After initially denying that he had illegal drugs in his car, Mr. Capistran then admitted that he had some hydrocodone pills in the Tahoe.

The police advised Mr. Capistran of his Miranda Rights, and he agreed to speak with them without the presence of an attorney. Mr. Capistran then stated that he had 500 hydrocodone pills in the center console of his car. Mr. Capistran explained that he had been given the pills by Kevin Murphy and was transporting them from Boston Pharmacy in Boston to Murphy Drugs in Thomasville. But Mr. Capistran had no paperwork dealing with the transference of the drugs, and the label on the pill bottle had been torn off. When asked if he had additional pills at his home, Mr. Capistran admitted that he had another 200 pills there.

Agents drove with Mr. Capistran to his home, located at 453 Oakridge Avenue in Boston, Georgia, and with Mr. Capistran's consent, the police searched the home. In his bedroom, the police found the 200 additional hydrocodone pills Mr. Capistran had confessed to possessing in the brown suit jacket where he said they would be located. The police recovered additional hydrocodone from M.L., another resident in the home, who admitted to getting the pills without a prescription from Kevin Murphy.

Next, Thomas County-Thomasville Narcotics/Vice Commander Kevin Lee went to Boston Pharmacy and made contact with Kevin Murphy, who agreed to come to the police station for questioning. On the way there, Kevin Murphy made the spontaneous statement that he was only doing what his father had told him to do, and he was only doing favors for people. At the station, Kevin Murphy was read his Miranda rights and signed a waiver before giving a



videotaped interview. During the interview, Kevin Murphy admitted to giving Mr. Capistran the hydrocodone the police had seized that day and confessed that he had provided pills to Mr. Capistran approximately once a week for five to six months. Kevin Murphy stated the number of pills he had given Mr. Capistran on different occasions had varied, but that it had included delivery of 1000 count bottles of hydrocodone approximately five times, for which he had been paid $500 for the 1000 pills. Kevin Murphy also said that he would keep the money from hydrocodone sales – which he estimated was between $4000-8000 – in a bag behind the counter of the pharmacy separate from the store cash register, and the money from Mr. Capistran was labeled "Wayne," "Wayne Delivery," IGA," or "Grocery Store."

During the interview, Kevin Murphy repeatedly said that his actions had been at the direction of this father, Wayne Murphy, and that he had "only done this" since Wayne Murphy got sick earlier in the year. At various points, Kevin Murphy admitted to giving drugs on an every-other-day basis – including hydrocodone, Viagra, antibiotics, Xanax, inhalers, Ambien and Phentermine – to numerous people who lacked prescriptions. Kevin Murphy said there was a file in the pharmacy titled "Wayne's People" which listed the people he had been told to "take care of" if they wanted drugs but lacked a prescription. Kevin Murphy then wrote in his own handwriting a map of where the police could find items in the pharmacy, including the "Wayne's People" list and the bag containing money from Mr. Capistran. At this point, a local attorney called on behalf of the Murphy family and asked the police to stop questioning Kevin Murphy.

After the interview, Commander Lee obtained a search warrant for Boston Pharmacy. Executing the warrant, agents found a red and black tote bag containing approximately $22,000.00 located where Kevin Murphy had said they could find the money he had received from Mr. Capistran. The money inside the bag was packaged as Kevin Murphy said it would be

packaged. Police also found a folder labeled "Wayne's People" which contained approximately ten names. Karen Dunlap, a pharmacist at Boston Pharmacy, was present during the search warrant. Ms. Dunlap indicated that a door in the pharmacy leading to an adjacent space marked as the "Boston Clinic" led to Kevin Murphy's office. In the clinic area, officers found numerous items belonging to both Kevin Murphy and Wayne Murphy, including bank statements and other papers with their names.

Thomas County officers interviewed a number of Boston Pharmacy employees that evening, including A.S., who stated that some hydrocodone pills had come into the pharmacy that morning, and she had observed Kevin Murphy remove the labels from the bottle. Later, A.S. saw Mr. Capistran come into the pharmacy and leave with the pills. A.S. further stated that she had observed Kevin Murphy sell pills to customers who come in with old pill bottles and no prescription.

The next day – November 7, 2009 – Commander Lee was contacted by Georgia Drug and Narcotics Agent Jerry Walker. Special Agent Graham Rusk of the GBI also joined the investigation, meeting again with Ms. Dunlap to ask her follow-up questions. When questioned about the adjoining space next to the pharmacy where agents found numerous bottles of unmarked medications, Ms. Dunlap stated that only Kevin Murphy goes to that area of the building and indicated he is very secretive. Agent Rusk directed Ms. Dunlap's attention to the medication lying on the floor and medication being stored in unmarked bottles and asked if she thought that was a normal practice for pharmacies and why Kevin Murphy was operating the pharmacy in that manner. Ms. Dunlap responded that she does not pay attention to what Kevin Murphy does and then indicated she wanted to speak with an attorney before answering any further questions.

13



Following the searches and interviews, the Georgia Drug and Narcotics Agency (GDNA) requested records from the primary wholesalers identified as selling controlled substances (Schedule II, III, IV, and V drugs like hydrocodone and oxycodone) to Boston Pharmacy. A comparison of wholesaler sales records with the pharmacy dispensing records revealed a significant variance between the controlled substances that were ordered and dispensed by the pharmacy for 2008 and most of 2009. For the controlled substances, the audit revealed that Boston Pharmacy was ordering much larger quantities than they were dispensing.

On May 28, 2014, Mr. Capistran was interviewed again by law enforcement in the presence of his attorney. Mr. Capistran stated that he has known Kevin Murphy for approximately 13 to 14 years, and said that in the summer of 2009 he had gotten into a tight spot while in school and had asked Kevin Murphy if he could get Mr. Capistran some hydrocodone. Kevin Murphy agreed, and Mr. Capistran stated that he got Hydrocodone pills from Kevin once or twice a month or once a month for approximately 5 months. Mr. Capistran said that his receipt of hydrocodone had included both 500 count and 1000 count bottles, and that when he dealt with Kevin Murphy, he did so at Boston Pharmacy. Mr. Capistran said that he paid Kevin Murphy between $.75 and $1.00 a pill and he sold them for between $3.00 and $3.50 a pill. Mr. Capistran said that he received between 10,000 and 12,000 hydrocodone pills from Kevin Murphy during the 5 month time period. Mr. Capistran also received between 100 and 200 Xanax pills from Kevin Murphy on a weekly basis for approximately 5 months, for a total of 2000 – 4000 Xanax pills. Mr. Capistran paid Kevin Murphy $.50 per Xanax pill and sold them for $1.00 - $1.50. Mr. Capistran admitted to the police that he did not have a valid prescription for the Hydrocodone or the Xanax that he received from Kevin Murphy during the 5 month period in 2009.



Defendant now admits that he possessed with intent to distribute Hydrocodone, a Schedule III controlled substance.

For purposes of relevant conduct under U.S.S.G. Section 1B1.3, Defendant and the Government stipulate and agree that the amount of illegal drugs attributable to Defendant is 57,393 units of hydrocodone and 4,000 units of alprazolam, *aka*, Xanax.

Defendant and the Government further stipulate and agree that these drugs were obtained directly from manufacturers and contained a detectable amount of a Schedule III controlled substance, to wit: hydrocodone, and a detectable amount of a Schedule IV controlled substance, to wit: alprazolam.

For purposes of Role in the Offense under U.S.S.G. Section 3B1.1(c), Defendant and the Government stipulate and agree that Defendant was not an organizer, leader, manager, or supervisor in a criminal activity.

Finally, for purposes of Role in the Offense under U.S.S.G. Section 3B1.3, Defendant and the Government stipulate and agree that Defendant used a special skill, to wit his position as a pharmacist, in a manner that significantly facilitated the commission or concealment of the offense.

15



(9)
## ACCEPTANCE OF PLEA AGREEMENT

Defendant understands and has fully discussed with Defendant's attorney that this agreement shall become effective only upon the Court's acceptance of this agreement and the Court's acceptance of the plea of guilty by Defendant.

SO AGREED, this 15th day of October, 2014.

MICHAEL J. MOORE
UNITED STATES ATTORNEY

PETER D. LEARY
Assistant United States Attorney
Georgia Bar Number 612045
United States Attorney's Office
Middle District of Georgia
Post Office Box 1702
Macon, Georgia 31202-1702
Telephone: (478) 752-3511
Fax: (478) 621-2655

*Attorneys for the United States of America*

I, KEVIN MURPHY, have read this agreement and had this agreement read to me by my attorney, J. Converse Bright. I have discussed this agreement with my attorney, and I fully understand it and agree to its terms.

_____
KEVIN MURPHY
DEFENDANT


I, J. Converse Bright, attorney for Defendant KEVIN MURPHY, have explained the Information and the Government's evidence received through discovery and my investigation of the charge to Defendant. I believe Defendant understands the charge against Defendant and the evidence that would be presented against Defendant at a trial. I have read this agreement, have been given a copy of it for my file, and have explained it to Defendant. To the best of my knowledge and belief, Defendant understands this agreement.

_____
J. CONVERSE BRIGHT
ATTORNEY FOR DEFENDANT